**LOKER LAW, APC**
Matthew M. Loker, Esq. (279939)
matt.loker@loker.law
Charles Cummins, Esq. (354861)
charles.cummins@loker.law
132 Bridge Street
Arroyo Grande, CA 93420
Telephone: (805) 994-0177

**C.O. LAW, APC**
Clark Ovruchesky, Esq. (301844)
co@colawcalifornia.com
845 15th St., Suite 103
San Diego, California 92101
Telephone: (619) 356-8960

*Attorneys for Plaintiff*,
Gene Anthony Diaz

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GENE ANTHONY DIAZ,** | **Case No.:** |
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:** |
| **v.** | |
| **CITIBANK, N.A.,** | **I.   ELECTRONIC FUNDS TRANSFER ACT;** |
| Defendant. | **II.  CALIFORNIA COMMERCIAL CODE SECTION 11201, ET SEQ.; AND** |
| | **III. CALIFORNIA'S ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT** |
| | **DEMAND FOR JURY TRIAL** |

CASE NO.:                                                    *Diaz v. Citibank, N.A.*

**COMPLAINT**

## INTRODUCTION

1. The stated purpose of the Electronic Fund Transfers Act, 15 U.S.C. § 1693, *et seq.* ("EFTA"), is to "provide a basic framework establishing the rights, liability, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693(b). EFTA's "primary objection ... is the provision of individual consumer rights." *Id.* Moreover, the language of EFTA indicates that the consumer protection measures contemplated by it are aimed at promoting disclosure, preventing fraud, and allocating liability. *Id.*, at 1693d-1. As Congress recognized in enacting EFTA, electronic banking transactions "processed through computer networks without human interaction" are "much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods." *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (quoting H.R. Rep. No. 95-1315, at 2 (1978)).

2. Understanding that the elderly community is a highly vulnerable class, in 1982 the California Legislature enacted the Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA") set forth in Welfare & Institutions Code §§ 15600, *et seq.* As such, elderly individuals have heightened rights and special statutory protections not afforded to other members of the general public. In 2008, the California Legislature made a material change to the EADACPA, which broadened the statute dramatically so that any person that "knew or should have known that [its] conduct is likely to be harmful to the elder" could be held civilly liable under the EADACPA. *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 736-37, 112 Cal. Rptr. 3d 439, 447 (2010).

///

///

///

CASE NO.:                                  1 OF 21                        *Diaz v. Citibank, N.A.*

**COMPLAINT**

3. GENE ANTHONY DIAZ ("Plaintiff"), by Plaintiff's attorneys, brings this action to challenge the actions of CITIBANK, N.A. ("Defendant") with regard to unauthorized electronic funds transfers and an unauthorized wire transfer that together wiped out the entire life savings of a 76-year-old man. These were funds he earned through a lifetime of work and a workers' compensation settlement. After Defendant's own branch, with actual documented notice of an active fraud threat, directed Plaintiff to restructure his accounts in a manner that created the precise vulnerability the fraudsters exploited, the entirety of those funds was stolen.

4. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

5. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

6. Unless otherwise stated, all the conduct engaged in by Defendant took place in California.

7. Any violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

8. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant named.

**JURISDICTION AND VENUE**

9. Jurisdiction of this Court arises pursuant to federal question jurisdiction under 28 U.S.C. § 1331. More particularly, this action arises out of Defendant's violations of the Electronic Fund Transfers Act, 15 U.S.C. § 1693, *et seq.*

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

11. Because Defendant conducts business within the State of California, personal jurisdiction is established.

12. This action arises out of Defendant's violations of: (i) the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, *et seq.* ("EFTA"); (ii) the California Commercial Code §§ 11201, *et seq.* ("UCC"); and (iii) the Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code §§ 15600, *et seq.* ("EADACPA").

13. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in Napa County in this judicial district; (ii) the conduct complained of herein occurred within this judicial district; and (iii) Defendant conducted business within this judicial district at all times relevant.

## DIVISIONAL ASSIGNMENT

14. Pursuant to Civil L.R. 3-2(d), this action is properly assigned to the San Francisco or Oakland Division. A substantial part of the events giving rise to Plaintiff's claims occurred in Contra Costa County, where Defendant's Pleasant Hill branch is located, and Plaintiff resides in Napa County. Both Contra Costa County and Napa County are designated under Civil L.R. 3-2(d) as counties assigned to the San Francisco/Oakland Division.

## PARTIES

15. Plaintiff GENE ANTHONY DIAZ is a natural person who resides in the County of Napa, State of California. Plaintiff is 76 years of age and is therefore an "elder" within the meaning of Welfare & Institutions Code § 15610.27. Plaintiff is a "person" as defined by Regulation E in 12 C.F.R. 1005.2(j).

16. Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1693a(6).

17. Plaintiff's accounts with Defendant constitute "accounts" as defined by 15 U.S.C. § 1693a(2) and 12 C.F.R. 1005.2(b)(1).

18. Defendant CITIBANK, N.A. is a national banking association with its principal office located in Sioux Falls, South Dakota, and is authorized to conduct and does conduct banking business in the State of California, including in Contra Costa County and Napa County. Defendant is a "person" as defined by Regulation E in 12 C.F.R. 1005.2(j). Defendant is a "financial institution" as defined by 15 U.S.C. § 1693a(9) and Regulation E in 12 C.F.R. 1005.2(i). Defendant routinely engages in the practice of electronic fund transfers as defined by 15 U.S.C. § 1693a(7).

## FACTUAL ALLEGATIONS

19. At all times relevant, Plaintiff is an individual residing within the State of California, in the County of Napa.

20. Plaintiff has been a Citibank customer for approximately 32 years and had never initiated a wire transfer during that time.

21. Prior to the events described herein, Plaintiff maintained two accounts with Defendant under his Citi Priority relationship: a checking account number 9174003047 ("Old Checking") and a Citibank® Savings Plus account number 40023863208 ("Old Savings"). As of January 1, 2026, the Old Checking account carried an opening balance of $25,449.13 and the Old Savings account carried an opening balance of $82,453.87, for a combined Citi Priority Relationship Total of $107,903.00.

22. In late December 2025, Plaintiff received the proceeds of a workers' compensation settlement in the form of two checks, each in the amount of $20,825.00, which were deposited into Plaintiff's Citibank savings account, bringing the savings account balance to approximately $82,453.87.

**The Fraudulent PIN Change and Defendant's Actual Notice**

23. On January 21, 2026, an unknown third party changed or attempted to change the PIN on Plaintiff's Citibank debit card ending in 8766 without Plaintiff's knowledge, authorization, or consent.

24. On January 22, 2026, Defendant sent Plaintiff a text message from Defendant's legitimate fraud alert short code, 95686, stating: "Free Msg Citi Fraud Dept: Please confirm you changed your PIN on 01-21 for card ending 66. YES=1, NO=2 or call 8449813985." Plaintiff immediately replied "2," confirming he had not authorized the PIN change. Defendant responded via text: "Free Msg Citi: Thanks. We will attempt to call you to secure your acct/card."

25. On January 22, 2026, following the exchange described above, Plaintiff called the telephone number printed on the back of his Citibank debit card and requested that his accounts be frozen. Defendant confirmed the accounts were frozen.

26. As of January 22, 2026, Defendant therefore had actual, documented notice of an active fraud threat targeting Plaintiff's accounts before Defendant's own branch directed Plaintiff to restructure those accounts entirely.

**The January 23, 2026 Branch Visit and Account Restructuring**

27. On January 23, 2026, Plaintiff traveled to Defendant's Pleasant Hill branch, located in Contra Costa County, California, to address the fraud threat.

28. At the Pleasant Hill branch, Plaintiff was assisted by Personal Banker Sekander Barati. Despite Defendant's actual knowledge of an active fraud threat against Plaintiff's accounts, Barati directed Plaintiff to close his existing accounts and open two brand new accounts, and to transfer all of his funds (his entire life savings) into the new accounts, representing that this was the appropriate security measure.

29. Barati provided Plaintiff with zero security instructions, zero warnings about online banking access or risk, and zero explanation of why opening entirely new accounts was necessary or safer than re-securing the existing frozen accounts. Plaintiff and his daughter were told only to wait for a new card in the mail.

30. Acting in reliance on the instructions of Defendant's employee, Plaintiff withdrew $22,500.31 from his existing checking account via teller at approximately 2:10 P.M. and $82,453.87 from his existing savings account via teller at approximately 2:13 P.M. Defendant's teller utilized Plaintiff's card ending in 8766 for both withdrawals. Total funds withdrawn from Plaintiff's original accounts: $104,954.18.

31. On the same day, January 23, 2026, Defendant opened two new accounts for Plaintiff: a new checking account ending in 6344 ("New Checking") and a new savings account ending in 6351 ("New Savings"). Defendant deposited $22,500.31 into New Checking and $82,453.87 into New Savings.

32. The New Checking and New Savings accounts were immediately absorbed into Plaintiff's existing 32-year Citibank online banking profile, meaning they were accessible through online banking from the moment they were opened.

33. Plaintiff was issued a temporary debit card upon leaving the branch on January 23, 2026. The temporary card never functioned and Plaintiff was unable to use it for any transactions.

34. Plaintiff's original debit card, ending in 8766—the card that Defendant's own system identified as associated with the fraudulent PIN change — was the same card used by Defendant's teller to process the January 23 withdrawals. Defendant's own account statements reflect card ending in 8766 throughout Plaintiff's transaction history.

**The Unauthorized Online Access and Probe Transfers**

35. Plaintiff's post-fraud online banking transactions on the ITF account were executed under the identifier "#8751 ONLINE," as reflected in Defendant's own account statements. Plaintiff used only his home computer to initiate transfers.

36. On January 26, 2026, just three days after the New Checking and New Savings accounts were opened, an unknown party executed $82,450.00 in back-and-forth online transfers between Plaintiff's New Checking and New Savings accounts. Specifically, at 2:31 P.M. Eastern Time, $82,450.00 was transferred from New Savings to New Checking online. At 3:51 P.M. Eastern Time, the same $82,450.00 was transferred back from New Checking to New Savings online. These transfers were not authorized by Plaintiff.

37. The January 26 probe transfers described above constituted unauthorized electronic fund transfers as defined by 15 U.S.C. § 1693a(12) and 12 C.F.R. 1005.2(m). Defendant had a duty to investigate and address these unauthorized transfers and failed to do so.

**The January 29, 2026 Unauthorized Wire Transfer**

38. On January 29, 2026, at approximately 2:25 P.M. Eastern Time (11:25 A.M. Pacific Time), there was an unauthorized $20,000.00 online from Plaintiff's New Checking account to Plaintiff's New Savings account, consolidating funds in advance of the wire transfer described below. This transfer was not authorized by Plaintiff.

39. This transfer directly caused Plaintiff additional damage because, without that unauthorized transfer, the New Savings account would have contained only $82,453.87 rather than $102,453.87, thereby reducing the maximum possible wire loss by $20,000.00.

40. On January 29, 2026, Plaintiff received a telephone call from an individual claiming to be "Michael" from Citibank, purportedly calling to discuss expediting Plaintiff's new debit card. The caller asked Plaintiff to confirm his name. Plaintiff confirmed only his name before the call disconnected. Plaintiff provided no one-time passcode, no account number, no Social Security number, no password, and no other authenticating information during this call.

41. On January 29, 2026, at approximately 11:43 A.M. Pacific Time, Plaintiff received a text message from telephone number (878) 333-0994—a regular ten-digit telephone number, not a Citibank fraud alert short code—signed "Michael levinstein Citi Bank Fraud Specialist." The text stated: "CITI: Looks like we got disconnected Mr. Diaz, but no worries looks like we completed everything and you should be getting your card tomorrow. If you have any questions this is my number and I will be your point of contact here at Citi bank. Thank you, Michael levinstein Citi Bank Fraud Specialist." This text was likely designed to distract Plaintiff from checking his account while the fraudulent wire was processed.

42. On January 29, 2026, Defendant placed a hold on a pending wire transfer from Plaintiff's New Savings account. Defendant then released that hold after receiving purported verification from a party other than Plaintiff. Defendant sent an email to Plaintiff stating: "The hold on your transfer was removed. Thanks for providing us with the information required to verify the following wire transfer from your SAVINGS account. This transfer was sent."

43. On January 29, 2026, Defendant debited $97,870.00 from Plaintiff's New Savings account as an outgoing domestic wire transfer to a payee identified as Ruslan K. (Reference Number: 292667594854223), along with a $17.50 wire transfer fee. Plaintiff did not authorize this wire transfer. Plaintiff had never initiated a wire transfer in 32 years of banking with Defendant.

44. Upon receiving Defendant's wire completion notification email at approximately 2:16 P.M. Pacific Time on January 29, 2026, Plaintiff promptly called Defendant. Plaintiff informed Defendant that he had not authorized the wire transfer and demanded that it be reversed. Defendant froze Plaintiff's accounts but informed Plaintiff that the funds had already been transferred to the receiving bank and could not be recalled.

45. At the time Defendant processed and approved the $97,870.00 wire transfer, Defendant knew or should have known that the transaction was unauthorized because, among other things: (a) Defendant had documented actual notice of an active fraud threat against Plaintiff's accounts since January 22, 2026; (b) the New Savings account from which the wire was sent was only six days old;(c) Plaintiff had never initiated a wire transfer in 32 years of Citibank banking history; (d) Plaintiff provided no meaningful verification to "Michael" beyond confirming his name; and (e) Defendant's own fraud detection system had flagged the wire sufficiently to place a hold on it.

46. At the time Defendant processed and approved the $97,870.00 wire transfer, Defendant knew or should have known that the transaction was unauthorized because, among other things: (a) Defendant had documented actual notice of an active fraud threat against Plaintiff's accounts since January 22, 2026; (b) the New Savings account from which the wire was sent was only six days old; (c) Plaintiff had never initiated a wire transfer in 32 years of Citibank banking history; (d) Plaintiff provided no meaningful verification to "Michael" beyond confirming his name; and (e) Defendant's own fraud detection system had flagged the wire sufficiently to place a hold on it.

47. Notwithstanding all of the foregoing, Defendant failed to apply commercially reasonable security procedures, failed to make further inquiry, and approved and executed the wire transfer.

**The January 30, 2026 Unauthorized Teller Withdrawal**

48. On January 30, 2026, at approximately 2:53 P.M., a teller cash withdrawal of exactly $2,300.31—the precise remaining balance in Plaintiff's New Checking account after an Amazon ACH debit of $200.00 had cleared that morning—was made from Plaintiff's New Checking account, zeroing it out entirely.

49. Also on January 30, 2026, Plaintiff returned to Defendant's Pleasant Hill branch alone, met with Personal Banker Sekander Barati, and opened a third account titled in trust for his daughter Sunny Milat ("ITF Account"), account number 42047733292. Plaintiff transferred the remaining $4,566.37 from his New Savings account to the ITF Account by teller. The $4,566.37 was deposited into the ITF Account as the opening deposit the same day.

50. Plaintiff did not authorize any cash withdrawal from the New Checking account on January 30, 2026, and made no cash withdrawals during either of his branch visits on January 23 or January 30, 2026. Plaintiff believed he was transferring the balances of both remaining accounts to the ITF Account. The $2,300.31 cash withdrawal was never deposited into the ITF Account or any other account belonging to Plaintiff. The $2,300.31 is unaccounted for and was potentially taken without Plaintiff's knowledge or authorization while Plaintiff was present in Defendant's branch meeting with Defendant's employee Sekander Barati.

51. Also on January 30, 2026, an Amazon debit of $200.00 was charged to Plaintiff's New Checking account. Plaintiff did not authorize this charge. The temporary debit card Plaintiff received on January 23, 2026 never functioned and Plaintiff was unable to use it to initiate any transactions, including any Amazon purchase.

///

///

**Defendant's Investigation and Repeated Denials**

52. Plaintiff timely submitted a fraud dispute to Defendant with respect to all unauthorized transactions described herein, within 60 days of receiving account statements showing the unauthorized transactions.

53. As part of Plaintiff's dispute, Plaintiff provided Defendant with, among other things, a copy of his police report filed with the Napa Police Department (Case No. NPD26800027), his IC3 complaint filed with the FBI on February 7, 2026, and his CFPB complaint filed on February 7, 2026.

54. On approximately March 3, 2026, Defendant denied Plaintiff's fraud claim, stating only that "Our review, which determined the disputed transaction(s) were not fraudulent."

55. On approximately April 7, 2026, Defendant's own fraud team contacted Plaintiff directly to discuss the claim. During that call, Plaintiff confirmed to Defendant's representative that he had never authorized the wire transfer and had never conducted a wire transfer in his life. Plaintiff's daughter, who was present, noted that Defendant's representative attempted to lead Plaintiff toward admitting authorization rather than conduct a neutral inquiry.

56. On approximately April 20, 2026, Defendant denied Plaintiff's appeal, stating "No new information was received or discovered that would change the denial decision." This denial was issued despite the fact that Defendant's own fraud team had conducted a call with Plaintiff two weeks earlier that confirmed Plaintiff's lifelong lack of wire transfer history, which was information directly relevant to the fraud determination.

///

///

///

57. Defendant's investigation was unreasonable. More specifically, Defendant should have discovered from its own records, including Plaintiff's dispute materials, that the transactions at issue were unauthorized and fraudulent. Defendant did not have a reasonable basis for believing that Plaintiff's account was not in error.

58. Defendant failed to adequately consider that Plaintiff promptly reported the fraudulent transactions by calling Defendant promptly after receiving the wire completion notification.

59. Defendant failed to adequately consider that Plaintiff had no history of making false or unverifiable fraud reports, no criminal history, no history of irresponsible use of his account, and no history of frauds or disputes with any other financial institution.

60. Defendant failed to adequately consider that Plaintiff had never initiated a wire transfer in 32 years of banking with Defendant.

61. Defendant failed to adequately consider that Plaintiff's New Checking and New Savings accounts were only six days old at the time of the wire, having been opened at Defendant's own direction on January 23, 2026, with knowledge of an active fraud threat.

62. Defendant failed to adequately consider that Defendant's own fraud detection system had placed a hold on the wire—demonstrating that Defendant's own systems recognized it as suspicious—and that the hold was released based on verification provided by the fraudster, not by Plaintiff.

63. Defendant knowingly and willfully concluded that Plaintiff's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of its investigation.

///

///

CASE NO.:                          **12 OF 21**                     *Diaz v. Citibank, N.A.*
**COMPLAINT**

64. On approximately May 5, 2026, Defendant issued a final response to Plaintiff's dispute, maintaining the denial of all claims and stating that it would no longer respond to inquiries regarding the matter and would not release any internal records without a valid subpoena.

65. On multiple occasions after the fraud, when Plaintiff called Defendant's legitimate customer service number—the number printed on the back of Plaintiff's debit card—Defendant's representatives asked Plaintiff for his Social Security number and account numbers over the telephone, contrary to Defendant's own stated fraud prevention policy prohibiting such requests. When Plaintiff declined to provide this sensitive information, Defendant's representatives transferred Plaintiff from department to department without resolution. This occurred on at least three separate occasions.

66. Through this conduct, Defendant violated 15 U.S.C. § 1693f and 15 U.S.C. § 1693g.

67. The unauthorized online transfers described above were unauthorized electronic fund transfers as defined by 15 U.S.C. § 1693a(12) and 12 C.F.R. 1005.2(m).

68. To date, Defendant continues to hold Plaintiff responsible for the fraudulent transactions and has retained Plaintiff's funds.

69. Since Plaintiff's efforts to be absolved of the unauthorized fraudulent transactions were unsuccessful, Plaintiff was required to bring this action to finally resolve the dispute.

///

///

///

///

///

**Plaintiff's Damages**

70. As a result of Defendant's conduct described herein, Plaintiff has suffered substantial actual damages including, but not limited to: loss of $97,870.00 in wire funds; a $17.50 wire fee; loss of $2,300.31 in potentially unauthorized teller withdrawals; a potentially unauthorized $200.00 Amazon ACH charge; loss of time and opportunity costs associated with attempting to recover the stolen funds; severe emotional distress, mental anguish, anxiety, fear, hopelessness, frustration, humiliation, and related impairments to his enjoyment of life. Plaintiff, age 76, was forced into early retirement against his wishes and the stolen funds represented his entire life savings. Plaintiff is currently awaiting a hip replacement and is in significant physical pain, all of which has been substantially worsened by the stress and financial devastation caused by Defendant's conduct. Without these funds, and but for the support of his daughter, Plaintiff would have been unable to support himself.

## CAUSES OF ACTION CLAIMED BY PLAINTIFF

### COUNT I

### VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT
### 15 U.S.C. §§ 1693, ET SEQ. (EFTA)

71. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

72. The unauthorized online transfers executed on January 26, 2026 and January 29, 2026—including the $82,450.00 probe transfers and the $20,000.00 pre-wire consolidation transfer—were "unauthorized electronic fund transfers" as defined by 15 U.S.C. § 1693a(12) and 12 C.F.R. 1005.2(m).

73. Alternatively, such transfers constituted an "error" as defined by 12 C.F.R. 1005.11(a).

CASE NO.:                    14 OF 21                    *Diaz v. Citibank, N.A.*
**COMPLAINT**

74. The January 29, 2026 unauthorized transfer of $20,000.00 from Plaintiff's New Checking account to Plaintiff's New Savings account directly caused Plaintiff additional damage because, without that unauthorized transfer, there would not have been sufficient money in Plaintiff's New Savings account to fund the full $97,870.00 fraudulent outgoing wire. Without the unauthorized $20,000.00 transfer, the New Savings account contained only $82,453.87, reducing the maximum possible wire by $20,000.00.

75. The foregoing acts and omissions constitute numerous and multiple violations of EFTA, including but not limited to Defendant's failure to properly follow EFTA's error resolution procedures with respect to the unauthorized transfers described herein.

76. As a result of each and every violation of EFTA, Plaintiff is entitled to any actual damages pursuant to 15 U.S.C. § 1693m(a)(1); statutory damages pursuant to 15 U.S.C. § 1693m(a)(2)(A); treble damages pursuant to 15 U.S.C. § 1693f(e); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1693m(a)(3).

## COUNT II

## VIOLATION OF THE CALIFORNIA COMMERCIAL CODE CAL. COM. CODE §§ 11201, ET SEQ. (UCC ARTICLE 4A)

77. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

78. Under California Commercial Code § 11103, the wire transfer alleged above— the $97,870.00 outgoing domestic wire transfer executed on January 29, 2026—is a funds transfer governed by UCC Article 4A, as it was processed through a wire transfer system used primarily between financial institutions or between businesses.

79. The wire transfer was an unauthorized payment order within the meaning of the California Commercial Code. Plaintiff did not authorize, consent to, or ratify the wire transfer. Plaintiff provided no meaningful verification to any party—providing only his name in response to a single question from the fraudster impersonating a bank employee—and was neither aware of nor involved in the initiation of the wire transfer.

80. Defendant processed said unauthorized wire transfer without Plaintiff's knowledge or consent.

81. Plaintiff notified Defendant that the wire transfer was unauthorized within the statutory period defined by California Commercial Code §§ 11505 and 11204, calling Defendant promptly upon learning of the unauthorized wire transfer.

82. Defendant is obligated to refund the fraudulent wire transfer to Plaintiff under California Commercial Code § 11204. Defendant has failed to do so.

83. Defendant failed to maintain commercially reasonable security procedures to verify the identity of the persons requesting the wire transfer. Defendant's security procedures were not commercially reasonable given the unusual and objectively suspicious nature of this wire transfer, including because: (a) Defendant had actual documented notice of a fraud threat targeting Plaintiff's account since January 22, 2026—one week before the wire; (b) Plaintiff had never initiated a wire transfer in 32 years of banking with Defendant; (c) the New Savings account from which the wire was sent was only six days old; and (d) Defendant's own fraud detection system flagged the wire and placed a hold on it, which was then released based on verification from the fraudster, not Plaintiff.

///

///

///

| CASE NO.: | 16 OF 21 | *Diaz v. Citibank, N.A.* |
|---|---|---|
| | **COMPLAINT** | |

84. Defendant failed to properly follow reasonable security procedures to identify and authenticate the person requesting the wire transfer. Defendant failed to consider the totality of the circumstances available to it—including Plaintiff's account history, the age of the originating account, and its own prior actual notice of fraud—before approving and executing the wire.

85. As a result of Defendant's failure to maintain and follow commercially reasonable security procedures and to adhere to its statutory obligations, Plaintiff was damaged in the full amount of the unauthorized wire transfer and fee.

86. Because interest is awarded as a penalty for noncompliance with the UCC, and because Defendant's victims include a senior citizen, Plaintiff is also entitled to treble that penalty pursuant to Cal. Civ. Code § 3345.

**COUNT III**

**ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT**

**WELFARE & INSTITUTIONS CODE §§ 15600, ET SEQ.**

87. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

88. Plaintiff is 76 years of age and thus an "elder" within the meaning of Welfare & Institutions Code § 15610.27.

89. Under Welfare & Institutions Code § 15610.30(a), financial abuse of an elder occurs when an entity either directly or assists in the taking, secreting, appropriating, obtaining, or retaining of the real or personal property of an elder or dependent adult for a wrongful use.

90. Welfare & Institutions Code § 15610.30(b) clarifies that a wrongful use is broadly defined to include whenever an entity knew or should have known that its conduct is likely to be harmful to the elder.

91. Welfare & Institutions Code § 15610.30(c) clarifies that a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right.

92. Defendant directly financially abused Plaintiff within the meaning of Welfare & Institutions Code § 15610.30(a)(1) in two independent respects.

93. First, under the direct retention theory, Defendant wrongfully retains Plaintiff's property by refusing to reimburse Plaintiff for the unauthorized wire transfer and related losses. As described above, Plaintiff is entitled to a refund of the stolen funds pursuant to EFTA and the California Commercial Code. Defendant has refused to provide any such refund despite multiple claims, appeals, and a final demand. By retaining Plaintiff's funds—the entirety of his life savings—after multiple denials, Defendant has directly retained the real or personal property of an elder, and knew or should have known that such conduct would cause Plaintiff substantial harm.

94. Second, under the assistance theory, Defendant assisted in the fraudsters' taking of Plaintiff's property through its own affirmative institutional conduct. Specifically: (a) Defendant's own branch, with actual documented knowledge of an active fraud threat against Plaintiff's accounts, directed Plaintiff to close his secure frozen accounts and transfer his entire life savings into brand new accounts with no fraud detection history, no behavioral baseline, and no functioning access card—creating the precise vulnerability the fraudsters exploited; (b) Defendant's employee provided Plaintiff with zero security instructions, zero warnings about online access risk, and zero explanation of why this restructuring was necessary; (c) Defendant enrolled the new accounts into Plaintiff's existing online banking profile, allowing the fraudster's unauthorized access credential to gain access within three days; (d) Defendant processed and approved the $97,870.00 wire transfer despite every available

indicator of unauthorized activity; and (e) Defendant released a fraud hold on the wire based on verification by the fraudster after Defendant's own systems flagged the transaction as suspicious.

95. By refusing to reimburse Plaintiff in the amount of $100,187.81—representing the $97,870.00 unauthorized wire, the $17.50 wire fee, and the $2,300.31 potentially unauthorized teller withdrawal—Defendant directly violated Welfare & Institutions Code § 15610.30(a)(1) by retaining funds of an elder that it knew or should have known would cause the elder substantial harm.

96. Defendant's conduct was the proximate and foreseeable cause of substantial harm to Plaintiff, and Plaintiff has suffered and continues to suffer special and general damages as set forth herein, including the total loss of his life savings, severe and ongoing emotional distress, physical suffering worsened by financial stress, and forced deprivation of financial independence.

97. Based on the above, Plaintiff alleges that Defendant is liable for recklessness, oppression, fraud, or malice through its actions.

98. Defendant's conduct was a substantial factor in causing the foregoing harm which Plaintiff has suffered and continues to suffer.

99. As a direct and proximate result of Defendant's misconduct, and Defendant's failure to refund or credit the lost funds, Plaintiff has incurred and will continue to incur attorneys' fees and litigation expenses in an amount to be proven at trial. Plaintiff therefore seeks to recover any and all remedies permitted by the Civil Code and Welfare & Institutions Code, including attorneys' fees and expenses pursuant to Welfare & Institutions Code § 15657.5.

///

///

///

///

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant for:

- An award of actual damages pursuant to 15 U.S.C. § 1693m(a)(1);

- An award of treble damages pursuant to 15 U.S.C. § 1693f(e);

- An award of statutory damages of no less than $100 nor greater than $1,000 pursuant to 15 U.S.C. § 1693m(a)(2)(A);

- An award of costs of litigation and reasonable attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(3);

- An award of actual damages arising out of the unauthorized wire transfer and related losses under California Commercial Code §§ 11201, *et seq.*;

- An award of interest on the amount of losses incurred at the prevailing legal rate;

- An award of pre-judgment interest;

- Actual damages, reasonable attorneys' fees and costs, and punitive damages under Welfare & Institutions Code § 15657.5;

- A trebling of any and all civil or other penalty pursuant to Cal. Civ. Code § 3345, given that Plaintiff is a senior citizen;

- Punitive damages under Cal. Civ. Code § 3294;

- Any and all other relief the Court deems just and proper.

///
///
///
///
///
///
///

| CASE NO.: | 20 OF 21 | *Diaz v. Citibank, N.A.* |
|---|---|---|
| | **COMPLAINT** | |

**TRIAL BY JURY**

100. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.


Dated: June 5, 2026                                          Respectfully submitted,


                                                               **LOKER LAW, APC**


                                                          By:  /s/ Charles B. Cummins,
                                                          CHARLES B. CUMMINS, ESQ.
                                                          ATTORNEY FOR PLAINTIFF, ESQ.